IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

    *Plaintiff*,

    v.

PATRICK SMITH,

    *Defendant*.

Criminal No. ELH-18-17

**MEMORANDUM OPINION**

Patrick Smith, defendant, was convicted in 2019 of conspiracy to distribute heroin, for which he is serving a sentence of 120 months' imprisonment, with credit dating to April 5, 2018. *See* ECF 645 at 1-2.  Through counsel, he filed a "Memorandum In Support Of Emergency Motion For Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i)" (ECF 723), supported by exhibits.  The government's opposition is docketed at ECF 736 and is accompanied by exhibits. Smith filed a pro se reply.  ECF 790.

Defense counsel subsequently filed another "Memorandum In Support Of Emergency Motion For Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i)."  ECF 893.  The government filed another opposition (ECF 897), supported by exhibits.  And, Smith again filed a pro se reply.  ECF 903.  I shall refer to ECF 723 and ECF 893 collectively as the "Motion."

In addition, several of the defendant's family members and relatives have filed correspondence in support of the Motion.  ECF 894; ECF 895; ECF 901; ECF 902.

No hearing is necessary to resolve the Motion.  For the reasons that follow, I shall deny the Motion.

## I. Background

Defendant was indicted on January 11, 2018, along with seventeen others.  ECF 1.  A superseding indictment was filed on March 22, 2018 (ECF 157) adding another defendant.  Smith, the lead defendant, was charged with multiple offenses: conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. § 846 (Count One); possession of firearms by a prohibited person, in violation of 18 U.S.C. § 922(g)(1) (Count Eight); possession with intent to distribute heroin, in violation of  21 U.S.C. § 841(a)(1) (Count Nine); and possession of firearms in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c) (Count Ten).

On August 21, 2019, Smith entered a plea of guilty to Count One (ECF 645), pursuant to a Plea Agreement.  ECF 563.  The offense carries a mandatory minimum term of imprisonment of ten years, with a maximum of life imprisonment.  *Id.* ¶ 3.  The plea was tendered under Fed. R. Crim. P. 11(c)(1)(C), by which the parties agreed to a sentence of 120 months' imprisonment.  *Id.* ¶ 9.  Counts Eight, Nine, and Ten were dismissed.  *Id.* ¶ 10; ECF 645.

The Plea Agreement included a stipulation of facts.  ECF 563 at 10-11.  The stipulation reflects that from March 2017 to January 2018, defendant conspired with others "to obtain wholesale quantities of heroin and distribute one kilogram or more of that heroin at the street-level."  *Id.* at 10.  Smith "supplied two different heroin shops," each of which was led by a co-conspirator, whom the stipulation refers to as "Co-Conspirator 1" and "Co-Conspirator 2."  *Id.* Through a wiretap investigation and the use of pole cameras, law enforcement gathered evidence of "the large scale heroin distribution that occurred in both shops."  *Id.*

Co-Conspirator 1 was arrested on September 12, 2017.  *Id.*  After searching one of the phones in his possession, law enforcement learned that Co-Conspirator 1 was in contact with an

individual who went by the name "Pee." After further investigation, law enforcement identified the defendant as Pee and discovered that he was "Co-Conspirator 1's source of supply." *Id.*

Investigators then began tracking Smith's cell phone. *Id.* On the basis of the cell phone tracking information, investigators determined that on September 18, 2017, Smith met with Co-Conspirator 2 in a parking garage. *Id.* And, law enforcement intercepted conversations of the defendant on his cell phone. *Id.* at 11.

On October 26, 2017, law enforcement executed a search warrant at the defendant's residence. *Id.* Two firearms were found: a "semi-automatic .9mm Luger pistol," loaded with fourteen rounds of ammunition; and a "semi-automatic .40 caliber pistol," loaded with eleven rounds of ammunition. *Id.* In addition, investigators recovered 2,800 grams of heroin, which were hidden in a compartment within a coffee table. *Id.*

The stipulation also reflects that Smith "agree[d] that it was reasonably foreseeable to him that members of the conspiracy would distribute one kilogram or more of heroin," and that "he possessed firearms in furtherance of his drug trafficking." *Id.*

Sentencing was held on August 21, 2019. ECF 643. Smith, who was born in 1963, was fifty-six years of age at the time of his sentencing. ECF 647 (Amended Presentence Report, "PSR") at 3. With respect to the defendant's health, the PSR reflected that Smith had Diabetes Mellitus and hypertension, among other conditions. *Id.* ¶ 62.

The PSR reflected a final offense level of 29, *id.* ¶ 29, and a criminal history category of IV. *Id.* ¶ 39. Smith's advisory sentencing Guidelines called for a sentence ranging from 121 months to 151 months of incarceration. *Id.* ¶ 85.

According to the PSR, Smith previously served extensive sentences in the State system. *See id.* ¶¶ 29-36. During a two-month period in December 1981 and January 1982, defendant

3

committed multiple daytime housebreaking offenses. *See id.* ¶¶ 29-34. And, defendant committed a storehouse breaking offense. *Id.* ¶ 34. He received significant sentences, totaling about 30 years. *See id.* ¶¶ 29-34. Smith escaped from prison for four days in 1992. *See, e.g.*, *id.* ¶ 34. In 1996, he was paroled. *Id.* He was returned to incarceration in March 1997 for a violation of parole, but parole was continued shortly thereafter. *Id.*

In October 1997, defendant was arrested and charged with several drug offenses and a firearms offense, among other crimes. *See id.* ¶¶ 35-36. In 2002, he was convicted of multiple drug possession offenses, *id.* ¶ 35, and of maintaining a dwelling for keeping controlled substances and possession of a firearm during the commission of a felony. *Id.* ¶ 36. These convictions constituted a violation of parole. See *id.* ¶ 34. He was sentenced to twenty years' incarceration. See *id.* ¶¶ 35, 36. And, at a hearing on a motion for new trial, the defendant was found in contempt of court on three occasions. *Id.* ¶ 35.

At sentencing on August 21, 2019 (ECF 643), the Court imposed the agreed-upon sentence of 120 months of incarceration, pursuant to Fed. R. Crim. P. 11(c)(1)(C), with credit for time served since the defendant's arrest on April 5, 2018. *See* ECF 645. Notably, the sentence corresponded to the congressionally mandated minimum sentence.

Smith is currently serving his sentence at Yazoo City in Mississippi. *See* ECF 893 at 1: *see also Find an inmate*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Feb. 25, 2021); ECF 897; ECF 903.[1] By my calculation, Smith has served nearly thirty percent of his sentence, without accounting for good time credit. Neither side has provided defendant's projected release date. But, the BOP website indicates that Smith has a projected

---

[1] Smith was previously designated to FCI Petersburg Low. *See* ECF 723 at 1: ECF 893 at 1. Defense counsel suggests the facility in Mississippi is a "FCI" (ECF 893 at 1) but the government describes it as "USP." ECF 897 at 2, 4.

release date of October 12, 2026. *Find an inmate*, *supra*.

According to defendant, while incarcerated he has "taken substantial advance of <u>prison programming and educational courses</u>." ECF 723 at 11 (emphasis in original). The government points out that defendant has incurred three disciplinary infractions. ECF 736 at 24. Two infractions resulted from defendant's refusal to obey an order. *See* ECF 736-6. The other infraction was for being insolent to a staff member. *Id.*

Smith submitted a request for compassionate release to the Warden on April 19, 2020. ECF 736-2. The request was promptly denied. *Id.*

## II. Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson*, 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence. Section 3582 was adopted as part of the Sentencing Reform Act of 1984. It originally permitted a court to alter a sentence only upon a motion by the Director of the BOP. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief. *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate motion because § 3582 "vests absolute discretion" in the BOP).

5

However, for many years the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA").  *See* Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020).  As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release.  *McCoy*, 981 F.3d at 276.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.  But, in U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might warrant compassionate release.  *See McCoy*, 981 F.3d at 276. The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C).  *McCoy*, 981 F.3d at 276. However, as the *McCoy* Court observed, the policy statement was issued in 2006 and was last updated in November 2018, prior to the enactment of the First Step Act in December 2018.  *Id.*

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1 to U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows:

> 1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist

under any of the circumstances set forth below:

(A) **Medical Condition of the Defendant**.—

(i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

 (I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

Application Note 1(B) provides that age is an extraordinary and compelling reason where the defendant is at least 65 years of age, has serious physical or mental health issues, and has served at least 10 years in prison or 75% of the sentence. Application Note 1(C) concerns Family Circumstances. Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205. However, the Court may not rely on the Program Statement. Rather, the Court must consider the Sentencing Commission's policy statements. *United States v. Taylor*, 820 F. App'x 229, 229-30

(4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

As noted, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'"  *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").  However, as indicated, the policy statement in § 1B1.13 of the Guidelines was last updated in November 2018, before the enactment of the First Step Act.  Thus, it is only "directed at BOP requests for sentence reductions."  *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13).  In other words, "[b]y its plain terms…§ 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  *Id.* at *7; *see also United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-12 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180-81 (7th Cir. 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction."  *McCoy*, 981 F.3d at 283.  Therefore, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'"  *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230).

Nevertheless, as the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715

F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020).  If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *Dillon*, 560 U.S. at 826-27; *see also United States v. Trotman*, 829 Fed. App'x 607, 608-9 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020).   But, compassionate release is a "rare" remedy.  *Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

### III.  COVID-19[2]

Defendant filed his Motion while the nation is "in the grip of a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020). That crisis is COVID-19.[3]   The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, PX-20-1028, 2020 WL 2571168, at *1 (D. Md. May 21, 2020).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases).

---

[2] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[3] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*

That said, the COVID-19 pandemic is the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Although many people who are stricken with the virus experience only mild or moderate symptoms, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted). And, the pandemic "has produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *stayed*, 818 Fed. App'x 393 (6th Cir. 2020). Indeed, for a significant period of time, life as we have known it came to a halt. Although many businesses and schools reopened for a period of time, many are again subject to closure or substantial restrictions, due to the virulent resurgence of the virus in recent weeks.

The Court must also underscore that the virus is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. As of January 31, 2021, COVID-19 has infected more than 28.3 million Americans and caused over 507,000 deaths in this country. *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed Feb. 25, 2021).

Unfortunately, there is currently no cure or proven treatment that is generally available for the virus. But, the country has recently seen the rollout of two vaccines for COVID-19 (Pfizer and

Moderna). The vaccines were initially available primarily to health care workers and the elderly in nursing homes.  But the criteria for eligibility has since expanded.

Notably, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Therefore, once the BOP receives the vaccine, a prisoner at heightened risk will receive priority for receipt of the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f.  As of February 25, 2021, the BOP had 124,182 federal inmates and 36,000 staff.  And, by that date, the BOP had administered 56,705 vaccine doses to staff and inmates.  *See* https://www.bop.gov/coronavirus/ (last accessed Feb. 25, 2021).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that increase the chance of severe illness.  Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system.  *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, Ctrs. For Disease Control & Prevention (May 14, 2020), https://bit.ly/2WBcB16.

On June 25, 2020, and again on July 17, 2020, the CDC revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. Then, on November 2, 2020,

to reflect the most recently available data, the CDC again revised its guidance. *See People of Any Age with Underlying Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 2, 2020), https://bit.ly/38S4NfY.   According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; COPD; being immunocompromised; obesity, where the body mass index ("BMI") is 30 or higher; serious heart conditions, including heart failure and coronary artery disease; sickle cell disease; smoking; pregnancy; and Type 2 diabetes. *Id.* The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.

In addition, the CDC created a second category for conditions that "might" present a risk for complications from COVID-19. The factors that might increase the risk include asthma, cerebrovascular disease, hypertension, liver disease, cystic fibrosis, neurologic conditions, a compromised immune system, overweight (where the BMI is between 25 and 30), pulmonary fibrosis, thalassemia (a type of blood disorder), and Type 1 diabetes. *See id.*

Thus far, the only way to slow the spread of the virus is to practice "social distancing." *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed Dec. 9, 2020).  Social distancing is particularly difficult in the penal setting, however. *Seth*, 2020 WL 2571168, at *2.  Prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within

prisons and detention facilities is particularly high."). Prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate themselves from others. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

The Department of Justice ("DOJ") has recognized the unique risks posed to inmates and employees of the Bureau of Prisons ("BOP") from COVID-19. The DOJ has adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D.N.C. June 11, 2020). Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No.

116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, the Attorney General issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus.  *Seth*, 2020 WL 2571168, at *2.  Notably, the BOP has implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected.  Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."

As with the country as a whole, the virus persists in penal institutions.[4]   As of February 25, 2021, the BOP reported that 1,449 inmates out of a total of 124,182 inmates, and 1,624 staff out of some 36,000 BOP staff members, currently tested positive for COVID-19; 46,184 inmates

---

[4] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country.  Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2. More recently, on October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.  *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020),  https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems.*" America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

and 4,862 staff have recovered from the virus; and 222 inmates and four staff members have died from the virus.  Moreover, the BOP has completed 105,167 COVID-19 tests.  *See COVID-19*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus (last accessed Feb. 25, 2021).

With respect to USP Yazoo City, where the defendant is now a prisoner, as of February 25, 2021, the BOP reported that ten inmates and seven staff members tested positive for COVID-19 and 229 inmates and 12 staff recovered at the facility.  There has been one reported inmate death. And, at the facility, 262 staff and 113 inmates have been inoculated with the vaccine.  *See* https://www.bop.gov/coronavirus/ (last accessed Feb. 25, 2021).

### IV.  Discussion

### A.  Extraordinary and Compelling Reasons

Smith has moved for compassionate release on the ground that his health conditions render him particularly vulnerable to COVID-19.  *See* ECF 723 at 9.  The government acknowledges that the defendant's medical records show that he "has a history of Type 2 Diabetes Mellitus and continues to have issues with that condition," and that the defendant "currently suffers from asthma and hypertension."  ECF 736 at 16; *see* ECF 736-3.  Accordingly, the government concedes that the evidence as to Smith's medical conditions satisfies the "extraordinary and compelling" prong of the § 3582 analysis.  ECF 736 at 15-16, 18.

Despite the government's concession, in Smith's supplemental submissions he discusses his medical conditions further.  *See, e.g.*, ECF 893 at 12-13.  In particular, the defendant contends, in essence, that the medical care he has received at USP Yazoo City is deficient.  *Id.*  Some of his assertions are concerning.  But, the government sharply disputes Smith's assertions, drawing on his medical records in support.  *See* ECF 897 at 2-3.

In addition, the government points out that defendant "received a positive COVID-19 test"

16

in December 2020.  ECF 897 at 3; *see* ECF 897-1 at 1.  But, his medical records indicate that he has apparently recovered without serious effects on his health.  ECF 897 at 3; *see* ECF 897-1 at 1.

In light of the government's concession as to the "extraordinary and compelling" requirement, I need not address Smith's claims as to the quality of his medical care to resolve the Motion.  He has satisfied the "extraordinary and compelling" prong.  However, that does not end the inquiry.

### B.  Sections 3142(g) and 3553(a)

Relief is appropriate under 18 U.S.C. § 3582(c)(1)(A) only if the defendant "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).  To determine whether a defendant is a danger to the community, the Court must consider the factors under 18 U.S.C. § 3142(g), including the nature and circumstances of the offense, the history and characteristics of the defendant, and the danger that release would pose to any person or the community.

In addition, the Court must consider the factors set forth in 18 U.S.C. § 3553(a), as required by 18 U.S.C. § 3582(c)(1)(A).  These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.

Smith contends that although his "offense conduct (conspiracy to distribute heroin) was certainly serious, it <u>involved neither weapons</u> nor allegations of violence."  ECF 723 at 11 (emphasis in original); *see* ECF 893 at 11.  In addition, he asserts that "he has taken substantial advantage of <u>prison programming and education courses</u>," as noted.  ECF 723 at 11 (emphasis in

original); *see* ECF 893 at 11.  And, defendant states that he "has had the opportunity to reflect on his conduct and character defects and vows that he will be a law [abiding] citizen if he is granted relief."  ECF 723 at 11; *see* ECF 893 at 11.

The defendant conveniently overlooks the fact that as part of his plea agreement, he stipulated that "he possessed firearms in furtherance of his drug trafficking."  ECF 563 at 11.  As noted, the stipulation of facts reflects that two firearms were recovered from his residence during the execution of a search warrant, along with 2.8 kilograms of heroin.  *Id.* at 10-11.

Moreover, the conduct that gave rise to this sentence is troubling.  The defendant was the supplier of two drug trafficking organizations.  And, the distribution of at least one kilogram of heroin was foreseeable to him.  *Id.* at 11.  I agree with the government that the nature of Smith's offense weighs heavily here.

In addition, the PSR indicates that Smith served very lengthy periods of incarceration in the State system.  Yet, this did not deter defendant's continued course of criminal conduct.  For example, while defendant was on parole in 1997, he engaged in conduct that led to drug possession convictions and a firearm conviction.  *See id.* ¶¶ 34-36.  And, about five years after being released on parole in 2012, defendant was arrested for the conduct underlying his current offense.  *See id.* ¶ 34; ECF 563 at 10-11.  Clearly, despite the frequency and length of Smith's previous sentences, he continued down the wrong path.

Given the serious facts of the offense, defendant's role in the offense, and the leniency of the sentence, which was well below the Guidelines and corresponded to the statutory mandatory minimum, coupled with the defendant's prior criminal history and the abbreviated time that defendant has been incarcerated, the Court concludes that release under 18 U.S.C. § 3582(c)(1)(A) is not warranted at this time.

18

### V.  Conclusion

For the foregoing reasons, I shall deny the Motion (ECF 723, ECF 893), without prejudice.

An Order follows, consistent with this Memorandum Opinion.


Date:   March 1, 2021                                   _____/s/_____
                                                        Ellen Lipton Hollander
                                                        United States District Judge