IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

PATRICK SMITH
*Defendant*.

Criminal No.:  ELH-18-17

**MEMORANDUM OPINION**

This Memorandum Opinion resolves a renewed motion for compassionate release filed by

defendant Patrick Smith, who is now self-represented.  ECF 917; ECF 965.  He is serving a 120-

month sentence for conspiracy to distribute heroin, with credit for time served since April 5, 2018.

*See* ECF 645 at 1-2.[1]

On July 21, 2020, Smith, through retained counsel, submitted a motion for compassionate

release, pursuant to 18 U.S.C. § 3582(c)(1)(A).  *See* ECF 723.  By Memorandum Opinion (ECF

911) and Order (ECF 912) of March 1, 2021, I denied the motion, without prejudice.  In particular,

the Court found that, in light of the ongoing COVID-19 pandemic, defendant's numerous

underlying health conditions presented an extraordinary and compelling reason for his release.

ECF 911 at 15-16.  But, I determined that a balancing of the sentencing factors outlined in 18

U.S.C. § 3553(a) weighed against granting Smith the relief he requested.

---

[1] By Order of November 23, 2020 (ECF 819), this Court granted Smith's first petition for
post-conviction relief (ECF 756), in part.  In particular, I reissued the judgment that had been filed
on August 21, 2019 (ECF 645), in order to permit Smith to file a belated appeal.  *See* ECF 822.
Smith noted an appeal, through his former counsel (ECF 830), but he later withdrew that appeal.
Therefore, his appeal was dismissed.  ECF 870.

Instead, Smith has filed another motion to vacate under 28 U.S.C. § 2255, which is pending.
ECF 919.  Several amendments have been filed by Smith.  *See, e.g.*, ECF 965, ECF 978, ECF
1003, ECF 1008.  The government was recently ordered to respond to the amendments.  ECF 1011.
Therefore, the § 2255 motion is not yet ripe, and is not addressed here.

On March 23, 2021, Smith, pro se, filed a motion to amend his motion for compassionate release (ECF 917), and the motion is supported by an exhibit that contain medical records. ECF 918. Thereafter, on August 19, 2021, Smith filed another motion to amend (ECF 965) and an exhibit (ECF 966) in support of his motion. These filings were docketed after the Court's Memorandum of March 1, 2021, in which I denied Smith's first motion for compassionate release. Therefore, I shall construe ECF 917 and ECF 965 as renewed motions for compassionate release, which I shall refer to, collectively, as the "Motion."[2]

The government's opposition is docketed at ECF 985 (the "Opposition"). And, it filed three exhibits. *See* ECF 985-1 to ECF 985-3. Smith has replied. ECF 1002 (the "Reply"). He also provided one exhibit. ECF 1002-1.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall deny the Motion.

## I. Background[3]

Defendant was indicted on January 11, 2018, along with seventeen others. ECF 1. A superseding indictment was filed on March 22, 2018 (ECF 157), adding another defendant. Smith, the lead defendant, was charged with multiple offenses: conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. § 846 (Count One); possession of firearms by a prohibited person, in violation of 18 U.S.C. § 922(g)(1) (Count Eight); possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1) (Count Nine); and

---

[2] In any event, I shall grant leave to amend.

[3] Where appropriate, I have drawn on the facts described in my Memorandum Opinion of March 1, 2021. See ECF 911.

possession of firearms in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c) (Count Ten).

On May 23, 2019, Smith entered a plea of guilty to Count One of the Superseding Indictment (ECF 562), pursuant to a Plea Agreement.  ECF 563 (the "Plea Agreement").  The offense carries a mandatory minimum term of imprisonment of ten years, with a maximum of life imprisonment.  *Id.* ¶ 3.  The plea was tendered under Fed. R. Crim. P. 11(c)(1)(C), by which the parties agreed to a sentence of 120 months' imprisonment.  *Id.* ¶ 9.  Counts Eight, Nine, and Ten would be dismissed.  *Id.* ¶ 10; *see* ECF 645.[4]

The Plea Agreement included a stipulation of facts.  ECF 563 at 10-11.  The stipulation reflects that from March 2017 to January 2018, defendant conspired with others "to obtain wholesale quantities of heroin and distribute one kilogram or more of that heroin at the street-level." *Id.* at 10.  Smith "supplied two different heroin shops," each of which was led by a coconspirator, whom the stipulation refers to as "Co-Conspirator 1" and "Co-Conspirator 2." *Id.* Through a wiretap investigation and the use of pole cameras, law enforcement gathered evidence of "the large scale heroin distribution that occurred in both shops." *Id.*

Coconspirator 1 was arrested on September 12, 2017.  *Id.*  After searching one of the phones in his possession, law enforcement learned that Coconspirator 1 was in contact with an individual who went by the name "Pee." After further investigation, law enforcement identified the defendant as Pee and discovered that he was "Co-Conspirator 1's source of supply." *Id.*

Investigators then began tracking Smith's cell phone.  *Id.*  On the basis of the cell phone tracking information, investigators determined that on September 18, 2017, Smith met with

---

[4] Since sentencing, the defendant has filed numerous motions challenging various aspects of his guilty plea, the merits of the underlying case, and his legal representation.

Coconspirator 2 in a parking garage. *Id.* And, law enforcement intercepted conversations of the defendant on his cell phone. *Id.* at 11.

On October 26, 2017, law enforcement executed a search warrant at the defendant's residence. *Id.* at 10. Two firearms were found: a "semi-automatic .9mm Luger pistol," loaded with fourteen rounds of ammunition; and a "semi-automatic .40 caliber pistol," loaded with eleven rounds of ammunition. *Id.* In addition, investigators recovered 2,800 grams of heroin, which were hidden in a compartment within a coffee table. *Id.*

The stipulation also reflects that Smith "agree[d] that it was reasonably foreseeable to him that members of the conspiracy would distribute one kilogram or more of heroin," and that "he possessed firearms in furtherance of his drug trafficking." *Id.* at 11.

In the Plea Agreement, the parties contemplated a base offense level of 30, pursuant to § 2D1.1(c)(5) of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"). *Id.* ¶ 6(a). The parties also agreed that the offense level was subject to a two-level enhancement in accordance with U.S.S.G. § 2D1.1(b)(1), because Smith possessed a firearm during the commission of the instant offense. *Id.* And, the Plea Agreement contemplated three deductions for Smith's acceptance of responsibility. *Id.* ¶ 6(b).

Notably, the Plea Agreement did not include any agreement as to defendant's criminal history. *Id.* ¶ 7. Nevertheless, the parties agreed that a sentence of 120 months of incarceration was the appropriate disposition of the case. *Id.* ¶ 9.

Sentencing was held on August 21, 2019. ECF 643. Smith, who was born in 1963, was fifty-six years of age at the time. ECF 647 (Amended Presentence Report, "PSR") at 3. With respect to the defendant's health, the PSR reflected that Smith had Diabetes Mellitus, kidney disease, and hypertension, among other conditions. *Id.* ¶ 62. Moreover, the PSR advised that

4

Smith had struggled with substance abuse since his adolescence.  *See id.* ¶¶ 67-72.  However, Smith has never received substance abuse treatment.  *Id.* ¶ 72.

In addition, according to the PSR, Smith previously served extensive sentences in the State system.  *See id.* ¶¶ 29-36.  During a two-month period in December 1981 and January 1982, defendant committed multiple daytime housebreaking offenses.  *See id.* ¶¶ 29-34.  And, defendant committed a storehouse breaking offense.  *Id.* ¶ 34.  He received significant sentences, totaling about 30 years.  *See id.* ¶¶ 29-34.  Smith escaped from prison for four days in 1992.  *See id.* ¶ 34.  In 1996, he was paroled.  *Id.*  He was returned to incarceration in March 1997 for a violation of parole, but parole was continued shortly thereafter.  *Id.*

In October 1997, defendant was arrested and charged with several drug offenses and a firearms offense, among other crimes.  *See id.* ¶¶ 35-36.  In 2002, he was convicted of multiple drug possession offenses, *id.* ¶ 35, and of maintaining a dwelling for keeping controlled substances and possession of a firearm during the commission of a felony.  *Id.* ¶ 36.  These convictions constituted a violation of parole.  *See id.* ¶ 34.  He was sentenced to a total of twenty years' incarceration.  *See id.* ¶¶ 35, 36.  And, at a hearing on a motion for new trial, the defendant was found in contempt of court on three occasions.  *Id.* ¶ 35.  He was paroled in February 2012.  *Id.* ¶ 35.  And, his sentence was terminated in February 2018.[5]  *Id.* ¶ 35

The PSR reflected a final offense level of 29, *id.* ¶ 24, and a subtotal criminal history score of six points.  *Id.* ¶ 37.  However, because the instant offense was committed while Smith was on parole, two points were added.  *Id.* ¶ 38.  Thus, defendant's criminal history score was eight, which established a criminal history category of IV.  *Id.* ¶ 39.  Smith's advisory sentencing Guidelines called for a sentence ranging from 121 months to 151 months of incarceration.  *Id.* ¶ 85.  And, as

---

[5]  Defendant's parole was originally scheduled to expire in September 2023.  *Id.* ¶ 35.

noted, defendant's offense of conviction subjected him to a mandatory minimum sentence of 10 years.  *Id.* ¶ 84; *see* 21 U.S.C. § 841(b)(1)(A).

At sentencing on August 21, 2019 (ECF 643), the Court imposed the agreed upon sentence of 120 months of incarceration, pursuant to Fed. R. Crim. P. 11(c)(1)(C), with credit for time served since the defendant's arrest on April 5, 2018.  *See* ECF 645.  Notably, the sentence corresponded to the congressionally mandated minimum sentence.

According to defendant's first motion for compassionate release, Smith has "taken substantial advantage of prison programming and educational courses," while incarcerated.  ECF 723 at 11 (emphasis omitted).  However, the government advised that defendant incurred three disciplinary infractions since his current term of imprisonment began.  ECF 736 at 24. Two infractions resulted from defendant's refusal to obey an order.  *See* ECF 736-5.  The other infraction was for being insolent to a staff member. *Id.*

Smith submitted a request for compassionate release to the Warden on April 19, 2020.  ECF 736-2.   The request was promptly denied.   *Id.*   Thereafter, he filed his first motion for compassionate release with the Court.  *See* ECF 723.  As indicated, the Court found that defendant's medical conditions rendered him particularly vulnerable to COVID-19 and thus presented a basis for his release.  *See* ECF 911 at 16-17.  But, in light of the severity of Smith's crime, his criminal history, and the abbreviated portion of his sentence that he had served as of that date, I determined that Smith's release was not warranted.  *Id.* at 18.   Therefore, I denied the motion, without prejudice. *Id.* at 19.

BOP records reflect that Smith is currently serving his sentence at FCI Cumberland.  ECF 996 at 1; *see Find an Inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last

visited Dec. 21, 2021).[6]  Including credit for the roughly 16 months that preceded the date of defendant's sentencing, Smith has served about 44 months of his 120-month sentence.  He has a projected release date of October 12, 2026.  *See Find an Inmate, supra*.

## II. Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence.  Section 3582 was adopted as part of the Sentencing Reform Act of 1984.  Originally, a court was permitted to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g*., *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See*

---

[6] At the time of filing the Motion, defendant was incarcerated at FCC Yazoo City.  ECF 917 at 1.  He was transferred to FCI Cumberland on September 27, 2021.  ECF 1002-1 at 2; *see* ECF 992.

*Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA"). *See* Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020). As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release. *McCoy*, 981 F.3d at 276.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction

8

of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. But, in U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might warrant compassionate release. *See McCoy*, 981 F.3d at 276. The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C). *McCoy*, 981 F.3d at 276.

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D).

Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205. However, the Court may not rely on the Program Statement.  Rather, the Court must consider the Sentencing Commission's policy statements.  *United States v. Taylor*, 820 F. App'x 229, 229-30 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

However, as the *McCoy* Court recognized, 981 F.3d at 276, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act in December 2018.  Because the policy statement in § 1B1.13 of the Guidelines was last updated in November 2018, before the enactment of the First Step Act,  it is only "directed at BOP requests for sentence reductions."  *Id.* (citing U.S.S.G. § 1B1.13).  In other words, "[b]y its plain terms . . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  *McCoy*, 981 F.3d at 282; *see also United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-12 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180-81 (7th Cir. 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283.  Therefore, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'"  *Id.* at 284 (quoting *Zullo*, 976 F.3d at 230).

Nevertheless, as the movant, the defendant bears the burden of establishing that he is

entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F.Supp.3d 562, 565 (W.D. Va. 2020).  And, if the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *See Dillon v. United States*, 560 U.S. 816, 826-27 (2010); *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021); *see also United States v. Butts*, ___ F. App'x ___, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *United States v. Kibble*, 992 F.3d 326, 329-30 (4th Cir. 2021) (per curiam) (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 Fed. App'x 607, 608-9 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020); *United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021) (court must consider the § 3553(a) factors).

To be sure, compassionate release is a "rare" remedy.  *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D.N.C. Mar. 16, 2020).  But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law."  *High*, 997 F.3d at 187 (internal quotation marks omitted).

### III.  COVID-19[7]

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[8]  Defendant filed his first motion for compassionate release in July 2020.  ECF 723.  At that time, as now, the nation was "in the grip of a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases).  Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of it.  *Id.*

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").  Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 Fed. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis.  This is because the virus is highly

---

[7] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[8] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh.

Many people who are stricken with the virus experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).  As of December 21, 2021, COVID-19 has infected more than 51 million Americans and caused approximately 809,000 deaths in this country.  *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed Dec. 21, 2021).

In prior months, this country saw a reduction of COVID-19 cases.  In the fall the trend became more favorable.  *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021,     https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html     ("The number of new daily COVID-19 cases has plunged since peaking on Sept. 1.  Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region.").  But, the spread of the Delta variant reversed this trend. *See* Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021 "[i]nfections have spiked to the highest levels in six months").  Indeed, the Delta variant is thought to be more virulent and capable of causing more severe illness than were earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND     PREVENTION,     https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants"); Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021,     https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-

leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show.").

More recently, the emergence of the Omicron variant, around the world and in the United States, has sparked further cause for concern.  Although much remains unknown about Omicron, including its severity and the relative effectiveness of vaccines against the variant, it is believed to be highly contagious.  *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION,   https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021).  Authorities warn that there remain reasons for caution, including relatively low levels of vaccination in some parts of the country, as well as the encroachment of colder weather and the holiday season, which will lead to an increase in the number of indoor gatherings.  *See* Kamp & Abbott, *supra*.

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the virus.  Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system.  *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

The CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19.  Most recently in December 2021, it again updated its guidance to reflect the most available data.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Dec. 14, 2021), https://bit.ly/38S4NfY.  According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic lung

14

diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions, such as depression and schizophrenia spectrum disorders; substance use disorders; and tuberculosis. *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1. Furthermore, "[t]he risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

To stem the spread of the virus, people were urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). However, social distancing is particularly difficult in the penal setting. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020

WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others.  *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S.

493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."[9]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

---

[9] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

On May 8, 2020, two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum to implement the Attorney General's directives on the increased use of home confinement. The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

Although there is currently no cure for the virus, medical treatments have continued to improve. And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson).[10] Initially, the vaccines were made available to health care

---

[10] Questions as to the efficacy of the Johnson & Johnson vaccine have been raised as to the Delta and Omicron variants. *See J&J, Sinopharm, Sputnik V COVID-19 shots less effective against Omicron- study*, REUTERS (Dec. 17, 2021), https://www.reuters.com/business/healthcare-pharmaceuticals/jj-sinopharm-sputnik-v-shots-weaker-against-omicron-study-shows-2021-12-17/; Apoorva Mandavilli, *J&J Vaccine May Be Less Effective Against Delta, Study Suggests*, N.Y.

workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has expanded considerably, and the vaccine is now approved for all persons five years of age and older.  *See* Cheyenne Haslett, *FDA Authorizes COVID-19 Vaccine for Kids 5-11*, ABC NEWS, Oct. 29, 2021, https://abcnews.go.com/Politics/fda-authorizes-covid-19-vaccine-kids-11/story?id=80846188.  Approximately 71% of all persons twelve years of age and older are fully vaccinated.  *See How Vaccinations Are Going in Your County and State*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited Dec. 21, 2021).  And, 61% of the total U.S. population is fully vaccinated.  *See id.*  Moreover, about 58 million Americans have received a third or "booster" vaccine dose, which the CDC now recommends for all persons age 18 and older.  *See id.*; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated Dec. 9, 2021).

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf.  Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine.  *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020.  Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec. 21, 2020),  https://www.forbes.com/sites/walterpavlo/2020/12/21/  federal-bureau-of-

---

TIMES, (July 20, 2021), https://www.nytimes.com/2021/07/20/health/coronavirus-johnson-vaccine-delta.html.

prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f.   As of December 21, 2021, the BOP had 133,782 federal inmates and 36,000 staff.  And, by that date, the BOP had administered 274,241 vaccine doses to staff and inmates.  *See* https://www.bop.gov/coronavirus/ (last accessed Dec. 21, 2021).

As of December 19, 2021, the BOP reported that 367 out of a total 135,446 federal inmates and 245 BOP staff out of some 36,000 staff members, currently test positive for COVID-19; 41,791 inmates and 8,678 staff have recovered from the virus; and 273 inmates and seven staff members have died from the virus.  Moreover, the BOP has completed 127,091 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to FCI Cumberland, where the defendant is imprisoned, the BOP reported that as of December 21, 2021, out of a total of 1,210 inmates, zero have tested positive, zero have died of COVID-19, and 307 inmates and 81 staff have recovered at the facility. In addition, 241 staff members and 997 inmates at the FCI Cumberland complex have been inoculated with the vaccine.   *See*   https://www.bop.gov/coronavirus/,   Federal   Bureau   of   Prisons, https://www.bop.gov/locations/institutions/alm/ (last visited Dec. 21, 2021).  And, "BOP has administered to the defendant both doses of the COVID-19 vaccine produced by Pfizer."  ECF 985 at 10; *see* ECF 985-3 at 164-65.

## IV. Discussion

### A.

Smith argues that the Court should grant the Motion because his underlying health conditions render him particularly vulnerable to COVID-19 and thus constitute an extraordinary and compelling reason that warrants his release from prison.  ECF 917 at 1; ECF 965 at 1.  As mentioned, medical records submitted with Smith's first motion for compassionate release reflect

that he suffers from mild asthma, hypertension, Type 2 diabetes mellitus, and chronic kidney disease.  ECF 723-2 at 1.  And, updated records included with the Motion indicate, among other things, that in December 2020 Smith contracted COVID-19, which resulted in his hospitalization for a period of four days.  *See* ECF 918 at 4-6.

Further, defendant stresses that he has not received adequate medical treatment for his health conditions.  ECF 965 at 1.  In particular, Smith indicates that on May 20, 2021, he received lab results that reflected that "his kidney was failing at an alarming rate."  ECF 965 at 1.  Moreover, Smith advises that, on the same day,  he was placed "on the urgent priority list to get an ultrasound done and to see a kidney specialist."  *Id.*  On August 3, 2021, "Smith was taken to Merit Health Hospital."  *Id.*  But, he complains that as of his filing on August 9, 2021, he "still has not seen the kidney specialist and does not know the results of the ultrasound."  *Id.*[11]  And, Smith avers that  as of August 6,  2021, he had not yet received "any treatment for his failing kidney."  *Id.*

With the Opposition, the government provided more of Smith's medical records, current through September 9, 2021.  ECF 985-3.  The records corroborate Smith's reported health conditions and his previous COVID-19 infection.  *See, e.g.*, ECF 985-3 at 26, 32, 36.  They also confirm that on May 20, 2021, a BOP physician recommended a nephrology evaluation and a renal ultrasound, in light of defendant's kidney condition.  ECF 985-3 at 34.  The medical records reflect that Smith had an ultrasound on August 3, 2021.  *Id.* at 21-22.  And, two weeks later, on August 17, 2021, Smith received the results of his ultrasound, which revealed that his kidneys were "minimally echogenic, which may be seen in medical renal disease."  *Id.* at 18.  A "[n]on formulary request" was "submitted for Lantus due to inmate's declining renal function."  *Id.* at 19.  In

---

[11] As mentioned, ECF 965 was docketed on August 19, 2021.  But, it reflects that plaintiff drafted the document on August 9, 2021.  ECF 965 at 1.

addition, a four-week follow up was scheduled. *Id.* at 15. Moreover, BOP Health Services tentatively scheduled Smith to undergo a colonoscopy on October 5, 2021. *Id.* at 19. It also appears, however, that as of August 17, 2021, Smith had not received an evaluation by a nephrologist. *Id.* at 15. And, BOP records indicate that Smith has received two doses of an authorized COVID-19 vaccine. *See id.* at 119.

As explained earlier, the CDC considers hypertension, chronic kidney disease, and diabetes to be conditions that "can make you more likely to get severely ill from COVID-19." *See Certain Medical Conditions*, *supra*. In addition, the CDC cautions that "[t]he risk of severe COVID-19 increases as the number of underlying medical conditions increases in an individual." *Id.* Further, Smith is now 58 years of age. ECF 647 at 3. And, the CDC warns that "[o]lder adults are more likely to get severely ill from COVID-19." *See Certain Medical Conditions*, *supra*. In particular, the CDC advises: "More than 81% of COVID-19 deaths occur in people over age 65. The number of deaths among people over age 65 is 80 times higher than the number of deaths among people aged 18-29." *Id.*.

The government argues that defendant's health conditions no longer merit his compassionate release in light of the measures implemented by BOP to reduce the spread of COVID-19 and the fact that Smith has been vaccinated against COVID-19. ECF 985 at 2-4, 9-10. Defendant acknowledges his vaccination status but nevertheless contends that he "continues to be at significant risk of imminent harm . . . ." ECF 1002 at 1.

As an initial matter, Smith complains that his medical care in BOP custody has been deficient. *See* ECF 965 at 1. The BOP records submitted with the Opposition demonstrate that BOP officials are aware of Smith's health issues, and have addressed them, at least in part. *See* ECF 985-3 at 15-22.

22

In any event, I am of the view that Smith's multiple health conditions, coupled with the COVID-19 pandemic, qualify him for consideration for compassionate release.

To be sure, the COVID-19 vaccines effectively reduce the health risks posed by the coronavirus. But, the fact that Smith has received two doses of an authorized COVID-19 vaccine "does not negate that his underlying health conditions make him eligible for compassionate release." *Spriggs*, 2021 WL 1856667, at *3; *see United States v. Palmer*, PWG-13-623, 2021 WL 3212586, at *3 (D. Md. July 29, 2021) ("It is impossible to predict the impact of the vaccines on future strains of the virus, just as it is impossible to predict the impact of COVID-19 on [defendant's] specifical medical issues.").

Indeed, recent developments make clear that the pandemic may be with us indefinitely. And, the CDC has confirmed that breakthrough infections of COVID-19 among vaccinated individuals occur and, albeit in rare cases, they can result in death. *See Rates of COVID-19 Cases and Death by Vaccination Status*, Cᴎᴛʀs. ꜰᴏʀ Dɪsᴇᴀsᴇ Cᴏɴᴛʀᴏʟ, Oct. 15, 2021, https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status (last accessed Nov. 14, 2021). Several judges of this Court have concluded that an inmate is eligible for compassionate release, notwithstanding vaccinated status. *See, e.g.*, *United States v. Jenkins*, DKC-12-0043, 2021 WL 5140198, at **4-5 (D. Md. Nov. 4, 2021) (granting compassionate release to a defendant based on his obesity and chronic kidney disease, in spite of the fact that he was fully vaccinated against COVID-19); *United States v. Garcia*, CCB-11-569, 2021 WL 4846937, at *2 (D. Md. Oct. 15, 2021) (finding that a vaccinated defendant's diabetes and hypertension constituted extraordinary and compelling circumstances); *United States v. Hussain*, PWG-13-661, 2021 WL 3367822, at *4 (D. Md. Aug. 3, 2021) (explaining that a fully vaccinated defendant with a history of smoking as

well as a number of underlying conditions, including moderate asthma and hypertension, presented an extraordinary and compelling reason for his release).

Moreover, in the face of the threat posed by the Omicron variant, the CDC recently issued new recommendations, "encouraging everyone 16 and older to receive a booster shot" of an authorized COVID-19 vaccine. *See CDC Expands COVID-19 Booster Recommendations to 16- and 17-year-olds*, Cntrs. for Disease Control, Dec. 9, 2021, https://www.cdc.gov/media/releases/2021/s1208-16-17-booster.html (last accessed Dec. 21, 2021). Some experts warn that, without taking the appropriate precautions, the United States could soon see as many as 1 million COVID-19 infections per day. Emma Bowman, *U.S. Could See 1 Million Cases Per Day, Warns Departing NIH Director Francis Collins*, NPR, Dec. 19, 2021, https://www.npr.org/2021/12/19/1065575540/nih-director-francis-collins-omicron (last accessed Dec. 21, 2021). Notably, the parties have not presented any information concerning whether Smith has received a booster shot.

In addition, compelling reasons are not defeated because a defendant has had COVID-19. What Judge Chuang said in *United States v. Fletcher*, TDC-05-0179, 2020 WL 3972142, at *3 (D. Md. July 13, 2020), is apt: "Although [the defendant] may now be less vulnerable or immune from coronavirus, there is no certainty about whether individuals who have already had COVID-19 now have immunity." *See also United States v. Heyward*, PWG-17-0527, 2020 WL 3547018, at *2 (D. Md. June 30, 2020) (noting in grant of compassionate release to individual who had survived the virus "that a secondary contraction of COVID-19 is possible"); *United States v. Kess*, ELH-14-480, 2020 WL 3268093, at **6-7 (D. Md. June 17, 2020) (granting compassionate release to someone who had recovered from COVID-19 without requiring hospitalization and noting that

24

"other jurists have released inmates who have ostensibly recovered from COVID-19 based on extraordinary and compelling health reasons").

Based on the foregoing, I am of the view that Smith's health conditions qualify him for compassionate release.

## B.

The determination of an extraordinary and compelling ground for compassionate release does not end the analysis.  The coronavirus is not "tantamount to a 'get out of jail free' card." *United States v. Williams*, PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.).

Even where a court finds extraordinary and compelling reasons for compassionate release, relief is appropriate under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of the factors set forth in 18 U.S.C. § 3553(a). *See High*, 997 F.3d at 186; *see also United States v. Butts*, ___ F. App'x ___, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam).  These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.  *High*, 997 F.3d at 186.

Smith presents a number of arguments as to why the § 3553(a) sentencing factors militate in favor of his release.  ECF 1002 at 4-5.   These reasons are not persuasive.

First, defendant contends that his crime of conviction, conspiracy to commit a drug offense, does not "constitute[ ] a 'serious drug offense' of a 'controlled substance offense,'" and therefore he does not present a danger to the community.  ECF 1002 at 4 (citing *United States v. Norman*,

935 F.3d 232 (4th Cir. 2019)).  To be sure, defendant pled guilty to a violation of 21 U.S.C. § 846. *See* ECF 645 at 1.  And, in *Norman*, the Fourth Circuit determined that  a conviction under 21 U.S.C. § 846 is categorically not a qualifying offense for career offender purposes.  935 F.3d at 237-39.  But, Smith was not designated as a career offender.  Therefore, *Norman* is inapposite.

In my view, the nature of defendant's offense weighs heavily here.  Conspiracy to commit a narcotics offense is a serious crime.  In this case, defendant conspired to distribute one kilogram or more of heroin.  ECF 563, ¶ 1.  Indeed, Congress has expressed its view that this is a serious offense, given that the offense carries a mandatory minimum term of imprisonment of 10 years, with a maximum term of life imprisonment.  *Id.* ¶ 3.

Further, as part of his Plea Agreement, Smith stipulated that "he possessed firearms in furtherance of his drug trafficking."  *Id.* at 11.  The Plea Agreement indicates that two firearms were recovered from Smith's residence during the execution of a search warrant, along with 2.8 kilograms of heroin.  *Id.* at 10-11.  And, Smith was also charged, *inter alia*, with possession with intent to distribute heroin (Count Nine) and with use of a firearm in furtherance of drug trafficking (Count 10), under 18 U.S.C. § 924(c).  If he had gone to trial and been convicted of the offenses, he would have faced a mandatory, consecutive period of incarceration under § 924(c).

Second, Smith contends that he is unlikely to recidivate.  In support of his assertion, Smith points out that he is now 58 years of age, "housed at a camp," and, upon his release, he will serve a five-year term of supervised release.   ECF 1002 at 5.  The Court has also received letters from defendant's friends and family, which reflect that defendant enjoys a strong network of support. *See* ECF 936; ECF 1012.

But, defendant's post-sentencing conduct does not support Smith's assertion.  Notably, in *Pepper v. United States*, 562 U.S. 476, 492 (2011), the Supreme Court recognized that a

defendant's post-sentencing conduct "provides the most-up-to-date picture of [a defendant's] 'history and characteristics.'"(Quoting 18 U.S.C. § 3553(a)(1)).  Of relevance here, Smith has received three disciplinary infractions since the beginning of his sentence.  *See* ECF 736-5.  On March 5, 2020, Smith was sanctioned for refusing to obey an order.  *Id.*  Less than four weeks later, on March 30, 2020, defendant lost his privilege to visitation and the use of the phone for six months, following an incident in which he was insolent to a staff member.  *Id.*  And, on June 9, 2020, Smith was again sanctioned for refusing to obey an order.  *Id.*

In addition, defendant's criminal history is of concern to the Court.  As earlier described, Smith has previously served substantial sentences in the State system.  Yet, none proved sufficient to deter him from engaging in the serious criminal conduct that led to his current term of incarceration.  *See* ECF 647, ¶¶ 29-36.

Defendant also posits that he has served approximately 50% of his sentence.  ECF 1002 at 5.  But, this figure exaggerates the amount of time that defendant has served.  Defendant was sentenced on August 21, 2019.  Including the roughly sixteen months that Smith was in pretrial detention, before his sentence was imposed, he has served about 44 months to date.  *See* ECF 645 at 2.  This represents about 43% of his sentence, after accounting for good time credit.  Moreover, defendant's sentence was just below the Guidelines range of 121 to 151 months, and corresponded to the mandatory minimum sentence that Congress determined is necessary to reflect the severity of such an offense.  *See* ECF 647, ¶¶ 84-85; 21 U.S.C. § 841(b)(1)(A).  Thus, in my view, a 44-month term of incarceration is insufficient to warrant defendant's release.

Finally, Smith directs the Court's attention to a number of other defendants who, in his view, "were convicted of crimes far worse than the drug offense for which Smith stands convicted of," but were nonetheless granted compassionate release.  ECF 1002 at 4.  The Court cannot

accurately compare this case to cases over which it has not presided, because the opinions do not necessarily contain all pertinent facts.  But, it appears that Smith's case is distinguishable.

In particular, each defendant in the referenced cases had served a substantially longer term of incarceration than Smith has to date, or otherwise had a clean disciplinary record.  *See, e.g.*, *United States v. McPherson*, 454 F. Supp. 3d 1049, 1053 (W.D. Wash. 2020) (granting compassionate release to defendant who had served twenty-six years of a thirty-two year sentence); *United States v. Lewis*, 10-cr-60292, 2020 WL 4333489, at **1-2 (S.D. Fla. July 20, 2020) (finding that the release of defendant, pursuant to 18 U.S.C. § 3582(c)(1)(A), was warranted where defendant had served the "vast majority" of his 144-month sentence); *United States v. Johnson*, H-96-176, 2020 WL 3618682, at *2 (S.D. Tex. July 2, 2020) (releasing defendant, in relevant part, because he had "served almost all of a long sentence that reflects the serious nature of his crimes of conviction"); *United States v. Brown*, 2:18-CR-360-KOB-JEO, 2020 WL 5201224, at **1-2 (N.D. Ala. May 22, 2020) (explaining that all of the § 3553(a) factors and, in particular, defendant's clean disciplinary record, weighed in favor of release).

For these reasons, as well as those set forth in my Memorandum Opinion of March 1, 2021, (ECF 911), incorporated here, I am persuaded that Smith's release would be inconsistent with the sentencing factors in 18 U.S.C. § 3553(a).

### IV.  Conclusion

In light of the foregoing, I shall deny the Motion.  An Order follows, consistent with this Memorandum Opinion.


Date: December 23, 2021                              _____/s/_____

                                                                      Ellen L. Hollander
                                                                      United States District Judge